LANIER, Judge.
This action commenced as a suit in contract on an open account and for recognition of a materialman’s privilege on immovable property. The plaintiff is a supplier of concrete, and the defendants are the owners of the immovable property and the building contractor doing work on the immovable property. Judgment was stipulated in favor of the supplier and against the contractor for $15,563.69, with legal interest thereon from date of judicial demand until paid, a reasonable attorney fee and all costs. The claim against the landowners on the privilege was dismissed. The supplier took this suspensive appeal.
FACTS
Prior to July of 1986, Robert C. Lauer and George E. Schamberger were the owners of two contiguous tracts of land located near the City of Mandeville in St. Tammany Parish, Louisiana. Lauer and Schamber-ger commenced developing this property into a subdivision known as Audubon Trace. They contracted with Paving Contractors, Inc. (Paving) to do the necessary work. Lauer was the only officer, director and stockholder of Paving.
During the period of April 4, 1986, to July 3, 1986, Paving purchased $15,563.69 worth of concrete from Jimco, Inc. (Jimco) for the subdivision. Paving subcontracted with James Butler to do the concrete work for the subdivision. Paving never paid Jimco’s bill.
On July 2, 1986, Lauer executed a residential marketing agreement with Merrill Lynch Realty for the sale of Lots 1 *882 through 5 of Audubon Trace. This agreement expired on January 2, 1987. Merrill Lynch Realty put signs on the property. No lots were sold because the subdivision was never finally approved by St. Tammany Parish (Parish).
On September 19, 1986, Schamberger and his wife, Faith G. Schamberger, sold their interest in Audubon Trace to Lauer and his wife, Lisa M. Lauer, for $127,-290.42. On that same date, Mr. and Mrs. Lauer executed a collateral mortgage on Audubon Trace subdivision for $500,000, payable at the First Bank in Mandeville, Louisiana.
On December 17, 1986, Jimco filed a statement of its claim and privilege for materials furnished for work done in Audubon Trace subdivision.
On July 1, 1987, the branch manager for Coldwell Banker Residential Real Estate Services (Coldwell Banker) in Mandeville, Louisiana, sent the following letter to Lauer:
As per our discussion yesterday, concerning Audubon Trace Subdivision, it is my recomendation [sic] that in order to liquidate your lot inventory within a 12 month period, the following must be done:
1. All subdivision improvements must be complete.
2. General clean-up of subdivision and surrounding area (trash litter, underbrush, dead and fallen branches).
3. Lot prices must be drastically reduced to the price range of $16,000 to $17,000.
4. Construction must be started on at least 3 homes. These homes must sell in the $80’s to low $90’s and square footage to be 1700-1800.
If you have any questions, please give me a call.
Lauer testified no attempt to complete the construction of the subdivision took place after July of 1986. The latest Butler could have been at the subdivision was August of 1986. Although the subdivision was given preliminary approval by the Parish, it never received final approval because the sewerage treatment plant was not installed and, thus, the project was never completed. Lauer never talked to the Parish about the subdivision after July of 1986. Because the subdivision never received final approval by the Parish, the subdivision lots could not be legally sold. The bank refused to give further financing to Lauer in July of 1986. Because Lauer ran out of money and could get no further financing, no further construction was done after July of 1986. Lauer needed an additional $65,000 to $75,000 to finish the development. Lauer acquired the Scham-berger interest in the subdivision in September of 1986 and consolidated all of his obligations to the bank under one collateral mortgage. No money was advanced to him at this time. The last money Lauer received from the bank was in June or July of 1986. Paving had no recorded contract with Lauer.
Eddie Price, a Jimco sales representative, testified he checked the subdivision every two or three weeks for Jimco. Numerous attempts to contact Paving about payment were made, but none were successful. On October 28, 1986 (Price’s birthday), Price inspected the subdivision and observed that concrete aprons had been poured. Price did not see the actual pouring. Price acknowledged that the aprons could have been poured as early as October 7, 1986.
PRIVILEGE UNDER LOUISIANA PRIVATE WORKS ACT
(Assignments of Error Numbers 1, 2 and 3)
Jimco contends the trial court erred by finding that the Lauers abandoned the work on the subdivision more than 60 days prior to the date it recorded its statement of claim and privilege. Jimco asserts there was no abandonment as contemplated by La.R.S. 9:4822(C)(2) and (I) because work continued on the site as late as October of 1986, the Lauers had a marketing agreement with Merrill Lynch Realty that did not expire until January of 1987, the Lauers bought the Schamberger interest in the subdivision and refinanced with the bank in September of 1986, and, in July of *883 1987, Mr. Lauer consulted with Coldwell Banker about marketing the subdivision.
Jimco’s (the subcontractor) contract was with Paving (the general contractor); it was not with the Lauers (the owners). Thus, there are no contractual legal relations between Jimco and the Lauers. One of the purposes of the Louisiana Private Works Act (Act), La.R.S. 9:4801 et seq., is to create a privilege in favor of subcontractors, which attaches to the owner’s property, and, thus, protects the subcontractors. Marshall Achord Electrical Contractor, Inc. v. Zeagler, 527 So.2d 51 (La.App. 3rd Cir.1988). Pursuant to La.R.S. 9:4802(A)(3) and (B), Jimco had a claim (cause of action) against the Lauers secured by a privilege on the subdivision for the purchase price of the concrete furnished in developing the subdivision. Pursuant to La.R.S. 9:4823(A)(1), Jimco’s claim and privilege was extinguished if not preserved in the manner prescribed in La.R.S. 9:4822. Because no notice of the Lauer-Paving general contract was filed in accordance with La.R.S. 9:4811 and no notice of termination of the work was filed, the procedure for Jimco to use to preserve its claim and privilege is set forth in La.R.S. 9:4822(C)(2) and (I) as follows:
C. Those persons granted a claim and privilege by R.S. 9:4802 for work arising out of a general contract, notice of which is not filed, and other persons granted a privilege under R.S. 9:4801 or a claim and privilege under R.S. 9:4802 shall file a statement of their respective claims and privileges within sixty days after:
[[Image here]]
(2) The substantial completion or abandonment of the work, if a notice of termination is not filed.
[[Image here]]
I. A work is abandoned by the owner if he terminates the work and notifies persons engaged in its performance that he no longer desires to continue it or he otherwise objectively and in good faith manifests the abandonment or discontinuance of the project.
The work herein was not substantially completed. Thus, Jimco was required to file its statement of claim and privilege within 60 days after the Lauers “in good faith manifested] the abandonment or discontinuance of the project” as provided for in La.R.S. 9:4822(1). The burden is on Jim-co to show compliance with the proper procedure. Zeagler, 527 So.2d at 53.
Comment (i) for La.R.S. 9:4822(1) provides as follows:
(i) Subsection I is new. It recognizes and adopts the interpretation given the former act that abandonment of the work is equivalent to completion and starts the time for filing of claims as to works for which no contract is filed. See Jonesboro State Bank v. Tucker, 381 So.2d 578 (La.App. 2nd Cir.1980).
In Jonesboro State Bank v. Tucker, the owner stopped work on the construction project in April of 1978 because of lack of funds. The claimant lumber company filed its statement of claim and privilege in August of 1978. The trial court found the project was abandoned in April of 1978, and the lumber company’s statement of claim and privilege was not timely. On appeal, the lumber company asserted that the trial court erred because the owner continued to seek funds to complete the work after the work was stopped, and this showed no intent to abandon the project. The court in Tucker, 381 So.2d at 581 rejected this argument with the following rationale:
We are convinced that the subjective, uncommunicated intent of the owner in such cases should not be the determining factor in fixing the date of abandonment of a construction project.
We believe that the better approach to this problem is one that treats any unexplained and complete cessation of all work on any construction project in itself as a manifestation of intent on the owner’s part to abandon the project sufficient to put any furnisher of material or laborer on notice that the sixty days granted him for filing his lien may well have begun and he would permit sixty days to run from that date without filing his lien at his own peril. We think this is more in keeping with the requirement of *884 R.S. 9:4812 and the holding of National Homestead Ass’n v. Graham, supra [176 La. 1062, 147 So. 348 (1933),] as well as the strict construction rule applicable to all lien statutes....
This is particularly so since the burden of proving the timely filing of his lien is on the materialman or laborer.
In Clegg Concrete, Incorporated v. Kel-Bar, Inc., 393 So.2d 178 (La.App. 1st Cir. 1980), writ denied, 398 So.2d 531 (La.1981), a materialman delivered materials to the job site from October 19 to October 23, 1978. The first contractor left the job site on November 11, 1978, and never returned. The materialman filed its statement of claim and privilege on January 26, 1979. On February 20, 1979, the owner contracted with a second contractor to finish the job. The job was completed on May 12, 1979. The trial court held the claim and privilege were valid because there was no indication the owner abandoned the project. This court reversed the trial court with the following rationale:
In the case at bar, Clegg furnished materials to Kel-Bar through October 23, 1978. Kel-Bar halted work on November 11, 1978. Although the stipulation concedes that the defendant Kenaly continued his hope of completing the project and indeed eventually obtained another contractor to finish the work, we are of the opinion that allowing Kenaly’s hope of completion to serve as the basis for when the 60 day period begins to run could lead to absurd consequences which were never intended under the Private Works Act. In a case in which one contractor defaults on his job and another contractor is later hired by the owner, materialmen and laborers for the first contractor should have 60 days from the date of the last delivery of materials or last performance of labor by any one under the same contract within which to file their liens. The same reasoning should hold true whether a contractor is involved or the job is self contracted. If there is an interruption in the work that exceeds the applicable lien period, then the lien must be filed timely counting from the date the last materials were delivered or labor performed prior to the interruption. Otherwise, the interruption could last indefinitely and absurdity would reign. As Judge, now Justice, Lemmon stated in Jeffers Trust v. Justice, 253 So.2d 234 (La.App. 4th Cir. 1971), “A claimant knows when he performs his services or delivers his materials, and he knows whether or not he has been paid. It is not necessary to a claimant, nor is it fair to an owner or mortgagee, to extend the beginning of the lien period far beyond the date of the last furnishing of materials, services or labor....”
The first contractor in the case at bar defaulted on November 11, 1978. Clegg had 60 days from that date to file its lien. Having failed to file the lien within that time, Clegg’s privilege upon Kenaly’s property was not preserved and the lien is invalid. [Clegg Concrete, Incorporated, 393 So.2d at 179-180.]
Finally, the case of Stanley v. Falgoust, 398 So.2d 1240 (La.App. 4th Cir.1981) is reviewed in T. Harrell, Developments in the Law, 1981-1982, Security Devices, 43 La.L.Rev. 574-575 (1982), as follows:

Abandonment of the Work

The prior Act did not expressly establish a time for the filing of privileges when the work was abandoned by the owner. The jurisprudence, likening an abandonment to a completion of the work, held that the time for filing expires sixty days after the owner had “made some outward manifestation” of his intentions to discontinue the project. The new Act essentially adopts the same view. In Stanley v. Falgoust, the court found that the work had been abandoned more than sixty days before the filing of the notice of privilege; the owner had run out of funds and work had obviously ceased upon the job, although the owner apparently had evidenced some desire to continue it. He also borrowed money for the ostensible purpose of completing the project, giving a mortgage upon the property, but in fact used the money to finish other jobs he was working on. The trial court apparently was satisfied *885 that, despite his continued assertion of his intention to complete the job, the owner’s financial position and subsequent actions cast serious doubt upon whether he in fact intended to do so. The appellate court, deferring to the judgment of the lower court, affirmed on the grounds that the matter was essentially one of fact.
Neither the jurisprudence nor the new Act provide precise guidelines for resolving the question of when an abandonment takes place. Consequently, where an owner engaged in constructing an improvement on the land, either directly or through a contractor, ceases all activity for some extended period, it behooves those supplying materials or labor to the job to ascertain the nature of the stoppage. [Footnotes omitted.]
In his oral reasons for judgment, the trial court judge found that there was little or no work done on the project after July 3, 1986, with the possible exception of some work occurring in October of 1986. He correctly noted that Jimco had the burden of showing that some work occurred within sixty days prior to the filing of the statement of claim and privilege on December 17, 1986. He observed that Mr. Price’s testimony was that the work could have been done as early as October 7,1986, and, thus, Jimco failed to prove that the work was done between October 17 and December 17,1986. The trial court then made the following factual findings:
The question is did he otherwise objectively and in good faith manifest an adandonment [sic] of the project.
We had a project going on. It was going pretty much full blast. The plaintiff’s representative was there during the real active time insofar as their work was concerned and their supplies were concerned. And thereafter he kept an eye on the project and reported at credit meetings, I’m sure. And I’m quite sure his company is aware of the times for filing of liens on the property for nonpayment of the debt. But the point is that this Court finds that nothing went on, I’ve had no evidence of anything going on from July 3 until the earliest, October 7, and latest, October 27. So the work had stopped. Plaintiff’s representative was well aware it was stopped, was keeping an eye on it, was seeing whether or not it was going to recommence. He didn’t quite know. But under these circumstances, the Court will have to find that the plaintiff was — burdened with what he saw, the plaintiff did not see any activity for a long period of time and should have inquired more thoroughly than it did as to the owner’s intentions and what was going on or filing a lien at that time. The Court simply finds that the plaintiff has not shown that he filed a lien within sixty days from an adandonment [sic] of the project, said adandonment [sic] being known to the plaintiff herein by virtue of their weekly inspection of the premises from a period of approximately July 3 until sometime in late October.
The factual findings of the trial court are not clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
The Lauers manifested an abandonment of the project in July of 1986 when all major work stopped. Minor work was done at an indeterminate time in October of 1986. The subdivision could not be marketed until construction of it was completed and the Parish accepted it. The marketing efforts by the Lauers with Merrill Lynch Realty and Coldwell Banker were meaningless unless, and until, the subdivision was completed and accepted. In this factual and legal posture, the Tucker, Clegg Concrete, Incorporated and Stanley cases are controlling. The judgment of the trial court is correct.
These assignments of error are without merit.
DECREE
For the foregoing reasons, the judgment of the trial court is affirmed at appellant’s cost.
AFFIRMED.