30 So.3d 111 (2009)
Jonathan DRUMMOND, Rodney Drummond and Norma Lynne Drummond
v.
Elias Jacob FAKOURI, Jerry Fakouri, Adam Fakouri, and Safeco National Insurance Company.
No. 2009 CA 1069.
Court of Appeal of Louisiana, First Circuit.
December 23, 2009.
Rehearing Denied February 17, 2010.
*112 Steve C. Thompson, S. Layne Lee, Baton Rouge, LA, for Plaintiffs/1st Appellants, Jonathan Drummond, Rodney Drummond, and Norma Lynne Drummond.
Sidney W. Degan, III, Richard C. Badeaux, Travis L. Bourgeois, New Orleans, LA, for Defendant/2nd Appellant, Elias Jacob Fakouri, Jerry Fakouri, Adam Fakouri, and Safeco Ins. Co. of America.
Janice M. Reeves, Alfred B. Shapiro, Baton Rouge, LA, for Defendant/2nd Appellant, Elias Jacob Fakouri.
*113 Richard J. Petre Jr., Lafayette, LA, for Defendant/Appellee, Clarendon America Ins. Co.
Brent P. Frederick, Michael T. Beckers, Baton Rouge, LA, for Defendant/Appellee, E. Jacob Construction, Inc. d/b/a Fakouri Construction, Inc., and J.C.D.A. Family, LLC.
Before WHIPPLE, HUGHES, and WELCH, JJ.
HUGHES, J.
In this appeal, the plaintiffs and a defendant/homeowner's insurer appeal from the trial court's grant of summary judgment in favor of a corporate defendant, sued for the allegedly tortious actions of an employee; the summary judgment dismissed with prejudice all claims against the corporate defendant. For the following reasons, we affirm.

FACTS AND PROCEDURAL HISTORY
On May 19, 2006, while Jonathan Drummond was visiting Adam Fakouri, both of whom were seventeen years old, Adam accidentally shot Jonathan in the chest and stomach with a Colt .38 caliber handgun. As a result of the gunshot, Jonathan sustained severe and disabling injuries, including paralysis below the chest.
On May 16, 2007, Jonathan Drummond, Rodney Drummond, and Norma Lynne Drummond filed a petition for damages against: Adam Fakouri; Adam's parents, Elias Jacob Fakouri and Jerry Fakouri; and the Fakouris' homeowner's insurer, Safeco Insurance Company of America (Safeco).[1] Thereafter, plaintiffs filed a first supplemental and amended petition, naming as additional defendants: E. Jacob Construction, Inc. d/b/a Fakouri Construction, Inc. (E. Jacob Construction) and J.J.C.D.A. Family, LLC (J.J.C.D.A. Family), companies owned by the Fakouris; and Clarendon America Insurance Company (Clarendon), the commercial general liability insurer of E. Jacob Construction and J.J.C.D.A. Family. In the supplemental and amended petition, plaintiffs alleged that the gun at issue was used "as a tool of business by Mr. Elias Jacob Fakouri for protection when traveling to and from his rental properties, offices, and/or warehouse." Mr. Fakouri is a building contractor, and E. Jacob Construction is his construction business. J.J.C.D.A. Family is another family business, which owns rental property.
According to the petition, the gun was normally kept in Mr. Fakouri's work truck, which was used for his work with E. Jacob Construction and for J.J.C.D.A. Family. Plaintiffs further alleged that, because Mr. Fakouri was having work performed on the truck, he had removed the gun from his work truck and brought it into his home, where he sometimes performed business activities for E. Jacob Construction and J.J.C.D.A. Family. Thus, plaintiffs contended that Mr. Fakouri was acting in the course and scope of his employment with E. Jacob Construction and J.J.C.D.A. Family, when he removed the loaded gun from his work truck and negligently left the gun in an unsafe place, where it was accessible to minors, thereby rendering defendants E. Jacob Construction, J.J.C.D.A. Family, and Clarendon liable for Jonathan Drummond's injuries.
E. Jacob Construction then filed a motion for summary judgment, contending *114 that it was entitled to judgment in its favor, as a matter of law, because Mr. Fakouri, who was shopping at Wal-Mart at the time of the shooting, was not conducting any business for E. Jacob Construction at the time Jonathan was shot. Moreover, with regard to plaintiffs' contention that the gun was used as a tool of business by Mr. Fakouri, for his protection while traveling to various work sites, E. Jacob Construction asserted that, regardless of the veracity of that allegation, Mr. Fakouri's protection was not at issue at the time that Jonathan was shot, nor was Mr. Fakouri traveling to or from those work sites when the accident happened. Thus, E. Jacob Construction argued that because the gun was not being used for any purpose related to or benefitting the business at the time of Jonathan's injury, E. Jacob Construction was entitled to judgment in its favor, dismissing it from the suit with prejudice.
Following a hearing on the motion, the trial court granted the motion and rendered judgment dated January 15, 2009, dismissing with prejudice plaintiffs' claims against E. Jacob Construction.[2] From this judgment, plaintiffs and Safeco appeal.[3] Plaintiffs assign the following as error: (1) the trial court erred in its apparent decision to grant summary judgment to E. Jacob Construction by deciding a highly disputed, inherently factual question in E. Jacob Construction's favor as movant, namely by deciding that certain acts committed by Mr. Fakouri were not committed while in the course and scope of his employment with E. Jacob Construction; (2) the trial judge erred in substituting his own judgment based on his own experiences in carrying a gun, for that of a jury after a full trial, and by crediting an inapposite and irrelevant hypothetical based on his own beliefs and feelings regarding his own gun-carrying activities; and (3) to the extent the trial court's decision was based upon a determination that the acts and omissions of Mr. Fakouri were not negligent, the trial court erred because there are clear issues of disputed material fact as to whether the acts and omissions in question constituted negligence.
In its single assignment of error, Safeco avers that the trial court erred in granting summary judgment in favor of E. Jacob Construction.

DISCUSSION
The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action, except those disallowed by LSA-C.C.P. art. 969; the procedure is favored and shall be construed to accomplish these ends. LSA-C.C.P. art. 966(A)(2). Summary judgment shall be rendered in favor of the mover if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to *115 material fact and that mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966(B).
Appellate courts review summary judgments de novo under the same criteria that govern a district court's consideration of whether summary judgment is appropriate. Samaha v. Rau, XXXX-XXXX, pp. 3-4 (La.2/26/08), 977 So.2d 880, 882; Allen v. State ex rel. Ernest N. Morial-New Orleans Exhibition Hall Authority, XXXX-XXXX, p. 5 (La.4/9/03), 842 So.2d 373, 377; Boudreaux v. Vankerkhove, 2007-2555, p. 5 (La.App. 1 Cir. 8/11/08), 993 So.2d 725, 729-30.
In ruling on a motion for summary judgment, the judge's role is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. All doubts should be resolved in the non-moving party's favor. Hines v. Garrett, XXXX-XXXX, p. 1 (La.6/25/04), 876 So.2d 764, 765.
A fact is material if it potentially insures or precludes recovery, affects a litigant's ultimate success, or determines the outcome of the legal dispute. A genuine issue is one as to which reasonable persons could disagree; if reasonable persons could reach only one conclusion, there is no need for trial on that issue and summary judgment is appropriate. Id., XXXX-XXXX at p. 1, 876 So.2d at 765-66.
On motion for summary judgment, the burden of proof remains with the movant. However, if the moving party will not bear the burden of proof on the issue at trial and points out that there is an absence of factual support for one or more elements essential to the adverse party's claim, action or defense, then the non-moving party must produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial. If the opponent of the motion fails to do so, there is no genuine issue of material fact and summary judgment will be granted. LSA-C.C.P. art. 966(C)(2).
When a motion for summary judgment is made and supported as provided in LSA-C.C.P. art. 967, an adverse party may not rest on the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in LSA-C.C.P. art. 967, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be rendered against him. LSA-C.C.P. art. 967(B). See also Board of Supervisors of Louisiana State University v. Louisiana Agricultural Finance Authority, XXXX-XXXX, p. 9 (La.App. 1 Cir. 2/8/08), 984 So.2d 72, 79-80; Cressionnie v. Intrepid, Inc., XXXX-XXXX, p. 3 (La.App. 1 Cir. 5/14/04), 879 So.2d 736, 738.
The record before us establishes that Mr. Fakouri was the construction supervisor for E. Jacob Construction, his family-owned construction business.[4] His duties as construction supervisor included traveling to existing job sites, supervising all E. Jacob Construction jobs, and bidding on construction jobs. According to Mr. Fakouri, because of his job duties, he would spend about ninety percent of his work day traveling in his truck, which, at the time of the shooting accident, was a 2003 Chevrolet C 1500 owned by E. Jacob Construction. He considered his truck to be his "mobile office," where he kept files on all E. Jacob Construction jobs.
*116 In his deposition, offered by E. Jacob Construction in support of its motion for summary judgment, Mr. Fakouri testified that all his life, he had carried a gun with him any time he was driving, for personal protection, including when he was with his kids or on vacation. With regard to the particular gun at issue in this case, Mr. Fakouri testified that he personally owned the gun and that he normally kept it in his work truck, carrying the gun with him for protection when he visited the company warehouse, which he described to be in a "less desirable" or "rougher" area of town.
Mr. Fakouri further testified that he "liked" guns and collected them, though he was not "an avid shooter." Mr. Fakouri enumerated guns that he had in his collection, as including: a Ruger .22 automatic handgun, a Beretta .40 caliber pistol, a Browning 9 millimeter handgun, a 12-gauge automatic shotgun, a 12-gauge double-barrel shotgun, an AR .15 rifle, a Glenfield.22 bolt action rifle, a .223 Mini 14 rifle, and about five Winchester 30/30 lever action "cowboy version" rifles. Mr. Fakouri stated that he keeps his gun collection in a locked bedroom closet, though he thought Adam knew where the key to the closet was kept.
Mr. Fakouri further testified that he did not have a home office in his residence (located on Goodwood Boulevard), but rather, E. Jacob Construction had a separate office (located on Richcroft Avenue). Mr. Fakouri stated that he did not like to do work at home, but would sometimes look over paperwork after his family went to bed.
Prior to the accidental shooting at issue, Mr. Fakouri had removed all of his work papers and the gun from his company truck in order to have the truck serviced. When Mr. Fakouri took the gun out of his work truck, he placed the loaded gun on the counter portion of a china cabinet in the breakfast area of his home. The china cabinet was a "catch all place" for him, where he would put his keys, coins, and work papers. About two days after Mr. Fakouri placed the loaded gun on the china cabinet in his home, his son Adam accidentally shot Jonathan Drummond when he tripped over a threshold while carrying the gun after having taken it from the china cabinet to show it to Jonathan.
Thus, the question presented herein is whether the actions of Mr. Fakouri, as owner of and construction supervisor for E. Jacob Construction, in placing a loaded gun on a china cabinet in his home while his work truck was being serviced, were in the course and scope of his employment with E. Jacob Construction and, thus, could result in E. Jacob Construction being vicariously liable for those actions.
Regarding liability of E. Jacob Construction as Mr. Fakouri's employer, the principle of vicarious liability is derived from LSA-C.C. art. 2320, which provides in part, "[m]asters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed." (Emphasis added.) Pursuant to LSA-C.C. art. 2320, an employer can be held liable for an employee's tortious conduct only if the injuring employee is acting within the course and scope of his employment. Ellender v. Neff Rental, Inc., XXXX-XXXX, p. 5 (La.App. 1 Cir. 6/15/07), 965 So.2d 898, 901.
Generally, courts consider four factors when assessing vicarious liability, including whether the tortious act: (1) was primarily employment rooted; (2) was reasonably incidental to performance of employment duties; (3) occurred during working hours; and (4) occurred on the employer's premises. LeBrane v. Lewis, *117 292 So.2d 216, 218 (La.1974); Ellender, 965 So.2d at 901. See also Dickerson v. Piccadilly Restaurants, Inc., 99-2633, p. 4 (La.App. 1 Cir. 12/22/00), 785 So.2d 842, 845.
Under the LeBrane test, the determinative question is whether the employee's tortious conduct was so closely connected in time, place, and causation to his employment duties as to be regarded as a risk of harm fairly attributable to the employer's business, as compared with conduct motivated by purely personal considerations entirely extraneous to the employer's interest. Ellender, 965 So.2d at 901 (quoting LeBrane v. Lewis, 292 So.2d at 218); Dickerson v. Piccadilly Restaurants, Inc., 785 So.2d at 844.
After due consideration of this case on de novo review, we find the factors enunciated in the above-cited cases of LeBrane, Ellender, and Dickerson, when applied to the specific facts and circumstances presented herein, do not result in a conclusion that the negligent storage of Mr. Fakouri's personal handgun, in his residence, is imputable to his employer, E. Jacob Construction.
Firstly, we note that the negligent storage of the handgun did not occur within normal working hours, nor did it occur on E. Jacob Construction's premises. While it is arguable that unloading a work vehicle in preparation to have it serviced was "reasonably incidental to performance of employment duties," we do not find that the subsequent storage of Mr. Fakouri's personally owned handgun was "primarily employment rooted." While it could be more convincingly argued that the act of removing the handgun from the E. Jacob Construction-owned work truck was in furtherance of E. Jacob Construction's interest in obtaining mechanical service for the truck, the continued allegedly negligent storage of the weapon several days afterward, in the employee's personal residence, was too far removed from the original arguably work-related activity to be considered employment rooted. We conclude that as a personally owned item of property, contained within the employee's personal residence for several days, any negligence in the storage of the gun was likewise personal at that point in time. LeBrane's determinative test simply cannot be answered in the affirmative under the facts of this case; it cannot reasonably be said that Mr. Fakouri's allegedly tortious conduct was so closely connected in time, place, and causation to his employment duties as to be regarded as a risk of harm fairly attributable to the employer's business, as compared with conduct motivated by purely personal considerations entirely extraneous to the employer's interest. We conclude that storage of one's personal property in one's home several days after cessation of any work-related activities involving that property is clearly unconnected to the employer's interest.
Consequently, we find the trial court correctly determined that E. Jacob Construction was entitled to summary judgment dismissing the claims against it.

CONCLUSION
For the reasons stated herein, the January 15, 2009 judgment dismissing with prejudice the claims against E. Jacob Construction, Inc. d/b/a Fakouri Construction, Inc. is affirmed; each party is to bear his own costs of this appeal.
AFFIRMED.
WHIPPLE, J., dissenting.
I respectfully dissent from the majority's conclusion that E. Jacob Construction, Inc. was entitled to summary judgment in its favor, dismissing plaintiffs' claims against it. I believe that a question of fact *118 remains as to whether the actions of Mr. Fakouri, as owner of and construction supervisor for E. Jacob Construction, in placing a loaded gun on a china cabinet in his home while his work truck was being serviced, were in the course and scope of his employment with E. Jacob Construction and, thus, could result in E. Jacob Construction being vicariously liable for those actions.
Regarding liability of E. Jacob Construction as Mr. Fakouri's employer, the principle of vicarious liability is derived from LSA-C.C. art. 2320, which provides in part, "[m]asters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed." Pursuant to LSA-C.C. art. 2320, an employer can be held liable for an employee's tortious conduct only if the injuring employee is acting within the course and scope of his employment. Ellender v. Neff Rental, Inc., XXXX-XXXX (La.App. 1st Cir.6/15/07), 965 So.2d 898, 901.
Generally, courts consider four factors when assessing vicarious liability, including whether the tortious act: (1) was primarily employment rooted; (2) was reasonably incidental to performance of employment duties; (3) occurred during working hours; and (4) occurred on the employer's premises. LeBrane v. Lewis, 292 So.2d 216, 218 (La.1974). Under the LeBrane test, the determinative question is whether the employee's tortious conduct was so closely connected in time, place, and causation to his employment duties as to be regarded as a risk of harm fairly attributable to the employer's business, as compared with conduct motivated by purely personal considerations entirely extraneous to the employer's interest. Ellender, 965 So.2d at 901.
Specific conduct may be considered within the scope of employment even though it is done in part to serve the purposes of the servant or a third person. Indeed, the fact that the predominant motive of the servant is to benefit himself or a third person does not prevent the act from being within the scope of employment. Ermert v. Hartford Insurance, 559 So.2d 467, 476-477 (La.1990). If the purpose of serving the master's business actuates, or motivates, the servant to any appreciable extent, the master is subject to liability if the act is otherwise within the service. The focus is on the servant and whether he was motivated, at least in part, to serve the master's business. Richard v. Hall, XXXX-XXXX (La.4/23/04), 874 So.2d 131, 138, 152.
In Ermert, the Louisiana Supreme Court addressed the determination of the scope of executive employment in a negligence case. The court noted that while the rules for determining liability of the employer for the conduct of both superior servants and the humblest employees are the same, the application of these rules may differ due to the dissimilarity of their duties and responsibilities. Ermert, 559 So.2d at 476. Additionally, while considerations such as whether the tort occurred on employer premises and during working hours are relevant in assessing conduct of a relatively subordinate employee, they are largely irrelevant in assessing conduct of a company's chief executive officer. See Ermert, 559 So.2d at 477. In a negligence case, the court need only determine whether the servant's general activities at the time of the tortious conduct were within the scope of his employment. See Ermert, 559 So.2d at 478.
Moreover, the scope of risks attributable to an employer increases with the amount of authority and freedom of action granted to the servant in performing his assigned tasks. Ermert, 559 So.2d at 477; see also *119 Richard, 874 So.2d at 138. As noted by the Court in Ermert:
This is the logical extrapolation of a rule that fixes liability based upon the course of employment: The greater potential course of employment expands the servant's potential opportunities to commit torts. These opportunities are maximized where the servant effectively determines the course of his own employment, as is the case when the servant is actually the owner of the enterprise.... [B]ecause of both the business owner's inherent incentives to pursue company interests whenever possible and the fact that the "servant" often controls the "master" rather than vice-versa, the line between "business" and "personal" activity is often a hazy one.
Ermert, 559 So.2d at 477.
In Ermert, the president and majority stockholder of a fence company accidentally shot a guest at a hunting camp. Ermert, 559 So.2d at 469-470. As chief executive and majority stockholder, the company president had established the practice of using the camp and his relationship with his hunting friends for the purpose of furthering the business interests of his employer, the fence company. Ermert, 559 So.2d at 469-470. Specifically, he sold fences to most of the other members of the camp, he derived other business through references from regular members of the hunting group, and he entertained customers and employees at the camp. Ermert, 559 So.2d at 470. On the weekend of the accident, the company president had gone to the camp to prepare the hunting blinds for the upcoming season and to fraternize with his hunting companions. Ermert, 559 So.2d at 478.
In concluding that the trial court's finding of vicarious liability on the part of the fence company was not manifestly erroneous, the Court noted that while the corporate president of the fence company used the camp partially for his own personal enjoyment and recreation, he also repeatedly and consistently used it for business purposes. Ermert, 559 So.2d at 478. Thus, the Court concluded that because the corporate president had repeatedly and consistently used the hunting camp for business purposes, the company had made the risks associated with waterfowling (which are not normally characteristic of the activities of fence companies) a part of its business. Ermert, 559 So.2d at 478.
Moreover, the Court found that while the company president was presumably motivated predominately to benefit himself recreationally, the trial court was not manifestly erroneous in finding that "the purpose of his business actuated him to an appreciable extent." Particularly, he had to join in preparing the duck blinds to reap the potential benefits of entertaining his company's customers, referrers, and employees at the camp during the coming duck season. Ermert, 559 So.2d at 478-479.
Similarly, in the instant case, while Mr. Fakouri at times used the gun at issue for personal protection on personal trips, the evidence presented in support of the motion for summary judgment, at a minimum, demonstrates that he also repeatedly and consistently used it for business purposes for protection in traveling to business sites in risky or unsafe areas for E. Jacob Construction. Moreover, the evidence suggests that the purpose of serving his business may have actuated or motivated him to an appreciable extent to remove the gun, and his other work-related items, from his company truck so that the company truck could be serviced.[1]
*120 Thus, based on de novo review, I would find that E. Jacob Construction failed to establish that it was entitled to judgment in its favor as a matter of law. Specifically, E. Jacob Construction did not make the requisite showing that there is an absence of factual support for an element of plaintiffs' claims that Mr. Fakouri's allegedly negligent act of improperly storing the gun after removing it from the company truck in connection with having the truck serviced was not an act in furtherance of E. Jacob Construction's business. Accordingly, in my opinion, the burden never shifted to plaintiffs to demonstrate that they could carry their burden of proof at trial.[2]See LSA-C.C.P. art. 966(C)(2); Nu-Lite Electrical Wholesalers, LLC v. Alfred Palma, Inc., XXXX-XXXX (La.App. 1st Cir.4/2/04), 878 So.2d 660, 663.
Because I would conclude that genuine issues of material fact remain as to whether E. Jacob Construction is vicariously liable for Mr. Fakouri's actions in removing from his company truck and thereafter negligently failing to properly secure or store the loaded gun he used for protection both personally and while performing the duties of his job as construction supervisor for E. Jacob Construction, I likewise would conclude that the trial court erred in granting summary judgment herein.
For these reasons, I respectfully dissent.
NOTES
[1] Safeco was originally named in the plaintiffs' petition as "Safeco National Insurance Company;" however, in its answer Safeco named itself "Safeco Insurance Company of America" and stated that it had been erroneously named in the petition.
[2] Clarendon also filed a motion for summary judgment, averring that it had no liability because: (1) Mr. Fakouri was not acting in the course and scope of his employment with E. Jacob Construction or J.J.C.D.A. Family at the time of the accident; (2) Mr. Fakouri was not an insured person under the Clarendon policy; and (3) Mr. Fakouri, E. Jacob Construction, and J.J.C.D.A. Family at no time acted negligently or breached any duty owed to plaintiffs. The trial court also granted Clarendon's motion for summary judgment, and that judgment is the subject of the related appeal in Drummond v. Fakouri, 2009 CA 1062, 25 So.3d 249, 2009 WL 5554589, also decided by this court on this date.
[3] While defendants Elias Jacob Fakouri, Jerry Fakouri, and Adam Fakouri were listed along with Safeco in the motion and order for appeal as appellants, the appellate briefs filed with this court list only defendant Safeco as appellant.
[4] Although Mr. Fakouri in his deposition also stated that he was the "owner" of E. Jacob Construction, no testimony or other evidence was introduced into the record to establish the corporate structure of the company.
[1] In support of its motion for summary judgment, E. Jacob Construction argued that it was entitled to summary judgment in its favor because, at the time of the accidental shooting, Mr. Fakouri was not engaged in any work-related activities and was not even at home, where the shooting occurred. However, I find no merit to E. Jacob Construction's attempt to so narrowly construe the principles of employer vicarious liability. Plaintiffs do not contend that the shooting itself was tortious conduct committed by Mr. Fakouri or that the tortious conduct of Mr. Fakouri occurred at the actual time of the shooting. Rather, they contend that his work-related actions in removing the gun from his work truck and thereafter negligently placing it where it was accessible to minors constituted tortious conduct which was a cause of the accidental shooting.
[2] Nonetheless, I note that Mr. Fakouri's answers to interrogatories, which were offered by plaintiffs in opposition to the motion for summary judgment, further support the result I would reach herein. Specifically, in his answers to interrogatories, Mr. Fakouri stated as follows:

I would always carry a firearm at dark (9:00 p.m. or later) at Woodale Court (near Airline and Tom) which is where the warehouses are where extra building materials are stored for E. Jacob Construction, or construction materials I use to repair rental properties. I had left the gun at my house on May 19, 2006 because I had unloaded the E. Jacob Construction truck of everything I use in my business, so that service could be done on it. Since I was taking my vehicle in for work, I unloaded the vehicle of all my commercial papers, plans and specifications and the gun that I carry out at the warehouses loaded with E. Jacob Construction building materials. If I had not been taking the E. Jacob Construction truck for service, I would not have taken the commercial papers and gun out of the truck because I use the truck like another office. I believe I had last carried the gun late on the evening of May 17, 2006 at the warehouses before I unloaded the truck.